FILED
United States Court of Appeals
Tenth Circuit

December 5, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BRITT JOY HAWKER; CRAIG DEE
HAWKER, as guardians for C.G.H., a
minor,

        Plaintiffs–Appellants,

v.

SANDY CITY CORPORATION;
OFFICER TINA MARIA ALBRAND,

        Defendants–Appellees.

No. 13-4139
(D.C. No.: 2:12-CV-00001-RSJ)
(D. Utah)

---

**PUBLISHED CONCURRENCE**

---

**LUCERO**, J., concurring:

But for the current state of the law, I would dissent. Given our present

jurisprudence in this circuit, however, I agree with the result my colleagues reach and

accordingly respectfully concur.[1] I write separately to express my disagreement with our

jurisprudence, which stems from what I consider to be an improperly and inadequately

developed state of the law for treating childhood criminal behavior. It is time for a

---

[1] My colleagues' nonprecedential order and judgment, in which I concur, is
Hawker v. Sandy City, No. 13-4139 (10th Cir. Dec. 5, 2014) (unpublished).

change in our jurisprudence that would deal with petty crimes by minors in a more enlightened fashion and would not automatically extend qualified immunity for conduct such as occurred in this case.

We have before us the following situation: A nine-year-old child has admittedly taken an iPad from school. His grandmother, commendably, sees the iPad at home and admonishes and directs him to return it to his school. So far, so good. In the process of returning the iPad, things go awry. The principal sees the child with the iPad, and after the child refuses to give it up, a school employee grabs it from his hands. A struggle ensues, with the child attempting to hit, kick, and head-butt three school employees, who eventually restrain him. When his grandmother is called, the child calms down. A police officer is also called, and the principal tells the officer she wants theft charges filed. While the child's grandmother looks on, the officer grabs the 67-pound child by the arm and yanks him off the floor, and then, after the child grabs the officer's arm, the officer puts him in a twist-lock, slams him against the wall, and handcuffs him.

These facts compel me to comment on the potential future consequences to the child and the ordeal suffered by the family at the center of this case and the broader phenomenon it unfortunately represents. The criminal punishment of young schoolchildren leaves permanent scars and unresolved anger, and its far-reaching impact on the abilities of these children to lead future prosperous and productive lives should be a matter of grave concern for us all. Focusing narrowly on the legal standards applicable

in this case renders it too easy to overlook the obvious question: Why are we arresting

nine-year-old schoolchildren?[2] Concededly, a nine-year-old is no longer in a bassinette,

yet that age group is a great deal closer to a pram than to graduation from high school.

I would like to believe that C.G.H.'s experience is uncommon, particularly for

such a young child. Those who monitor the conditions of our schools, however, tell us

otherwise. Police presence in educational settings, including elementary schools, is

pervasive. See Jason B. Langberg & Barbara A. Fedders, How Juvenile Defenders Can

Help Dismantle the School-to-Prison Pipeline: A Primer on Educational Advocacy and

Incorporating Clients' Educational Histories and Records into Delinquency

Representation, 42 J.L. & Educ. 653, 656 (2013) ("Armed police officers now can be

found in public schools around the country in drastically increased numbers. According

to the most recent national estimates, 17,000 law enforcement officers—often termed

'school resource officers' (SROs)—are assigned permanently to schools."); see also

Catherine Y. Kim, Policing School Discipline, 77 Brook. L. Rev. 861, 878 (2012)

("Jurisdictions lacking the resources to hire full-time police personnel nonetheless may

---

[2] Others have noted that a narrow focus on legal standards can blind us to the real impact of our decisions on children's lives. See, e.g., Ratner v. Loudoun Cnty. Pub. Sch., 16 F. App'x 140, 143 (4th Cir. 2001) (unpublished) (Hamilton, J., concurring) (stating that although "constrained to concur" in the majority opinion denying a child's constitutional claims relating to excessive school punishment, "I write separately to express my compassion for Ratner, his family, and common sense"); Hedgepeth v. Wash. Metro. Area Transit, 284 F. Supp. 2d 145, 160 (D.D.C. 2003), aff'd sub nom. Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth., 386 F.3d 1148 (D.C. Cir. 2004) (noting that, although the arrest of a child was constitutional under the applicable legal standard, "the Court can hardly overlook the humiliating and demeaning impact of the arrest" on that child).

regularly summon the local police department through calls for service."). "This phenomenon is not limited to middle and high school students. Shocking stories of children as young as six years old who are suspended, handcuffed, arrested, and detained appear with some frequency." Langberg & Fedders, 42 J. L. & Educ. at 658. This case presents but one such incident.

Police presence in schools is of course intended to serve the best interests of students and communities. Situations such as those at Sandy Hook and Columbine, as well as fears of rising school violence in recent decades, necessitate security in American schools.[3] See Ratner, 16 F. App'x at 143. So do policies adopted to address drug and gang problems. But it does not follow from the necessity of school security officers that elementary schoolchildren of a tender age need to be manhandled into a criminal law system in which they are treated as if they were hardened criminals and with a lack of finesse. Cf. id. (noting that the policy in question "has stripped away judgment and discretion on the part of those administering it").

Referral of students to law enforcement—so that even minor offenses are often dealt with and punished by police rather than school officials—is a key and growing

_____

[3] The nation's second deadliest school shooting occurred in December 2012 at the Sandy Hook Elementary School in Newtown, Connecticut. See James Barron, "A Nation Reels After Gunman Massacres 20 Children at School in Connecticut," N.Y. Times, Dec 14, 2012, http://www.nytimes.com/2012/12/15/nyregion/shooting-reported-at-connecticut-elementary-school.html. A recent Connecticut case describes the incident vividly: "At the end of that unimaginable day, we learned that we had lost 20 elementary school children and 6 teachers and administrators." Shew v. Malloy, 994 F. Supp. 2d 234, 259 (D. Conn. 2014) (quoting Connecticut Senate Session Transcript for April 3, 2013).

feature of modern school disciplinary policies.  See N.C. v. Commonwealth, 396 S.W.3d 852, 863 (Ky. 2013) (observing the "shift away from traditional in-school discipline towards greater reliance on juvenile justice interventions, not just in drug cases, but also in common school misbehavior that ends up in the juvenile justice system," and that "[t]his comes at a significant cost to state agencies and takes the student out of the normal education process, in addition to putting these students in contact with students who committed violent offenses, gang members, or other bad influences").  "The use of force by school police—in the form of physical restraints, non-lethal weapons, or firearms—is another example of traditional police methods migrating into school settings."  Tex. Appleseed, Texas' School-to-Prison Pipeline:  Ticketing, Arrest & Use of Force in Schools 119 (2010), available at http://www.njjn.org/uploads/digital-library/Texas-School-Prison-Pipeline_Ticketing_Booklet_Texas-Appleseed_Dec2010.pdf.  In the instant matter, it was Principal Webb who oversaw the officer's conduct and insisted that C.G.H. be cited for theft.

As C.G.H.'s experience typifies, "the presence of police in schools [has] had the effect of 'criminalizing' behaviors—such as minor scuffles, thefts, and 'disruptions of school assembly'—that would otherwise be handled by school officials."  Lisa H. Thurau & Johanna Wald, Controlling Partners:  When Law Enforcement Meets Discipline in Public Schools, 54 N.Y.L. Sch. L. Rev. 977, 981 (2009/2010).  Children are often "unaware of some of the more nuanced aspects of the law, or the extent of an officer's discretion, which can result in charges for less overt wrongdoing or passive participation leading to joint venture charges, disorderly conduct, simple assault, and resisting arrest."

Id. at 985.  These difficulties are evident in C.G.H.'s interaction with Officer Albrand.

Strict disciplinary policies coupled with the involvement of the criminal justice system in schools have recently gained a name:  the school-to-prison pipeline.  The phrase "refers to the practice of funneling students currently enrolled in school to the juvenile justice system or removing students from school temporarily or permanently, thereby creating conditions under which the students are more likely to end up in prison." Jason P. Nance, School Surveillance and the Fourth Amendment, 2014 Wis. L. Rev. 79, 83.  Over the last two decades, experts from many fields have documented the myriad negative consequences of the school-to-prison pipeline.  In addition to missing school when they are suspended or expelled, students who experience the harsh effects of these policies are more likely to struggle in classes, drop out, and suffer other negative effects on their educations.  See Udi Ofer, Criminalizing the Classroom: The Rise of Aggressive Policing and Zero Tolerance Discipline in New York City Public Schools, 56 N.Y.L. Sch. L. Rev. 1373 (2011/2012); see also Deb Delisle, Asst. Sec'y Elementary & Secondary Ed., "Asst. Secretary Delisle and Youth Lend Their Voices to Combatting the School-to-Prison Pipeline," Homeroom: The Official Blog of the U.S. Department of Education, http://www.ed.gov/blog/2012/12/asst-secretary-delisle-and-youth-lend-their-voices-to-combatting-the-school-to-prison-pipeline/ (collecting statistics on the negative impacts of the school-to-prison pipeline).  They are also more likely to become entangled in the juvenile and criminal justice systems.  Ofer, 59 N.Y.L. Sch. L. Rev. at 1401 ("Children who are removed from the learning environment, even for a few days, are more likely to drop out, use drugs, face emotional challenges, become involved with the juvenile justice

system, and develop criminal records as adults.").

"In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954). Although the Court initially penned those words sixty years ago, they continue to ring true today. And as Brown taught us, the judiciary can be an essential tool in ameliorating the barriers to education for our children and grandchildren. Although the phrase "school-to-prison pipeline" has become "part of the national lexicon," Thurau & Wald, 54 N.Y.L. Sch. L. Rev. at 981, it has yet to enter the lexicon of our courts. But see Hinds Cnty. Sch. Dist. Bd. of Trustees v. R.B. ex rel. D.L.B., 10 So. 3d 387, 412 (Miss. 2008.) (Graves, J., dissenting) (discussing "school-to-prison pipeline"). Clearly, aspects of the school-to-prison pipeline are more properly suited for resolution by policymakers and social scientists. But C.G.H. and thousands of other children needlessly thrust into the criminal justice system deserve better.

It is no doubt correct that early and positive intervention by family and educators will best realign an elementary school child's errant behavior and most likely lead to a productive life. That should be the educational goal of our school system in dealing with cases such as the one before us. It should be a societal goal. Our present jurisprudence is sending the wrong message to schools. It makes it too easy for educators to shed their significant and important role in that process and delegate it to the police and courts. We should change course and instead leave it to the factfinder to determine whether the handcuffing of six- to nine-year-old children is excessive force rather than giving schools and police a bye by holding them immune from liability. A more enlightened approach

to elementary school discipline by educators, police, and courts will enhance productive

lives and help break the school-to-prison chain.