**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 5, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

QUENTIN SCOTT,

        Plaintiff - Appellant,

v.

CITY OF ALBUQUERQUE; RAY
SCHULTZ, former Chief of Police; D.
HENSLEY, Albuquerque Police
Officer,

        Defendant - Appellees.

No. 15-2154
(D.C. No. 1:14-CV-0665-SWS-WPL)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **HOLMES**, and **MATHESON**, Circuit Judges.

A New Mexico statute makes it illegal to "willfully interfere with the

educational process" at a public school. N.M. STAT. ANN. § 30-20-13(D). In

2009, an Albuquerque Police Officer assigned to a middle school as a School

Resource Officer ("SRO") relied on that statute to arrest a thirteen-year-old for

skipping class. The main question before us is whether qualified immunity

---

[*]      This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with FED. R. APP. P. 32.1 and 10TH
CIR. R. 32.1.

shields that officer from a civil suit arising from the arrest. We find that it does. We also conclude that the plaintiff's other two claims—for municipal liability and violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132—have no merit.

# I

The relevant events happened in January 2009.[1] At the time, Quentin Scott[2] was a thirteen-year-old seventh-grader at Grant Middle School in Albuquerque, New Mexico. Scott had been diagnosed with bipolar disorder and oppositional defiant disorder. Both affected his behavior and concentration when he was in class.

Scott had a "504 plan"—a document acknowledging that a student has special needs—and an Individualized Education Program ("IEP") that detailed how his disabilities might affect him in class. The IEP listed a few accommodations for Scott in the classroom. Specifically, teachers were told to let him choose where he sat, to minimize auditory and visual distractions, and to let

---

[1] This is a qualified-immunity case decided at the summary-judgment phase, so we accept the plaintiff's version of the facts, so long as those facts have some support in the record. *See, e.g.*, *Thomson v. Salt Lake City*, 584 F.3d 1304, 1312 (10th Cir. 2009); *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).

[2] Though a minor at the time of his arrest, Quentin is apparently "now an adult." Aplt.'s App. at 306 (Dist. Ct. Order, dated Aug. 17, 2015). In his appellate briefing, his counsel refers to the plaintiff simply by his last name, "Scott"; thus, hereinafter, so do we. To avoid any possible confusion, we refer to Scott's mother, Charlotte Scott, by her full name.

him move around the classroom every so often. Scott also had permission to leave the classroom if he was anxious or distracted. *See* Aplt.'s App. at 217–22 (Individualized Education Program, dated Aug. 11, 2008) (advising teachers to give Scott "[f]requent breaks" and to "encourage [Scott] to . . . get a drink" in the hallway if he felt overwhelmed). Scott said that when he had those feelings, he was usually allowed "to just kind of roam the halls" and to "g[e]t [his] mind off whatever was troubling [him]." *Id.* at 84 (Dep. of Quentin Scott, dated June 8, 2015).

Scott usually went to the janitor's office during these breaks. *Id.* He later testified that the office "was just kind of [his] safe haven" and felt that the janitors seemed "very understanding with [him]." *Id.* at 84, 86. Most of the time, he helped them sweep or mop the floors. If they were on a break when he arrived, Scott would sit down, read a magazine, and eat sunflower seeds with them. That is what he did on the morning of January 16, 2009.

After getting frustrated in typing class, Scott told his teacher that he was taking a break. He left the classroom and sat down at a desk that his teacher had put in the hallway. He tried returning to class a few minutes later, but the lesson was too far ahead by that point, and he "was already at the point of just being done." *Id.* at 201. He signaled to the teacher that he was going for a walk, then headed down the hall to the janitor's office. *See* Aplt.'s App. at 201, 209 (Test.

3

of Charlotte Scott) (commenting that Scott was permitted to give "a nonverbal signal" to a teacher whenever he needed a break).

Scott was walking in the school hallway when Lupe Griego, the front desk secretary, noticed that he was out of class. Ms. Griego said something to Scott.[3] Scott did not hear her, so he continued walking to the janitor's office. Officer Damon Hensley, the SRO for Grant Middle School, heard Ms. Griego call out Scott's name. Officer Hensley later testified that, two days before the arrest, Scott had come into school "really late." *Id.* at 70. That instance of tardiness, along with the fact that Scott had run away from school once before, led Officer Hensley to think that Scott might be skipping class again. Officer Hensley asked Nancy Wiggins, Scott's teacher, whether Scott had permission to be in the hallway; Ms. Wiggins told Officer Hensley that she thought that Scott was skipping class.

Officer Hensley looked down the hallway towards the janitor's office. He saw Scott standing "like he was halfway in the door and halfway out the door." Aplt.'s App. at 72. He walked to the office and asked Scott if he had permission

---

[3]     It is unclear what Ms. Griego said, or whether Scott heard her. Officer Hensley testified that Ms. Griego stopped Scott and asked him why he was in the hallway, and the Incident Report notes that Scott told Ms. Griego that he was helping the janitors. Yet Scott testified that if Ms. Griego "yelled at [him]," he "just didn't hear her," and that he "never talked to anybody on that walk" to the janitor's office. Aplt.'s App. at 206. We accept Scott's version of the facts as true, as we must. *See Thomson*, 584 F.3d at 1312; *Riggins*, 572 F.3d at 1107.

to be there; Scott told Officer Hensley that he did. But Ms. Wiggins, who was standing next to Officer Hensley, disagreed, telling Officer Hensley that Scott was "not supposed to be" out of class. *Id.*

Officer Hensley "grabbed [Scott's] arm," "stood [him] up," and put him in handcuffs. *Id.* at 203. He took Scott out of the office, walking behind Scott and holding the links that connected the two cuffs. As they walked through the hallway, Scott stopped abruptly a few times because he was "pissed" by Officer Hensley's physical contact with his person and the physical force he was applying; more specifically, Scott "didn't want to be touched." *Id.* at 202. When Scott stopped, Officer Hensley would "wrench[]" the links to force Scott forward. *Id.*

They were in the hallway when the class bell rang. Crowds of students rushed out of nearby classrooms. Scott, still handcuffed, was suddenly surrounded by his peers and classmates. Officer Hensley continued to walk behind Scott and shove him forward by the handcuffs. Scott felt that this was deliberate. It seemed as though Officer Hensley "wanted other kids to see [him] being dragged around" and to "set it in [Scott's] head that [he] was a piece of shit." *Id*. at 198.

They reached Officer Hensley's office a few minutes later. He ordered Scott to sit. According to Scott's testimony, Officer Hensley began "interrogating" and mocking Scott, who had started crying out of fear. After

5

about twenty minutes, Ms. Wiggins and two other school administrators came into Officer Hensley's office to meet with Scott.

That meeting lasted for about an hour. Scott was handcuffed the entire time. Scott repeatedly complained to the administrators during the meeting about the pain that he was experiencing because of the handcuffs. Eventually, they noticed that Scott was in so much pain that he could not lift his arms to wipe away his tears, so Ms. Wiggins managed to loosen the handcuffs. Still, even after the cuffs were loosened, Scott felt pain in his arms and wrists. According to his testimony, his wrists "were bruised and swollen" for "at least a week afterwards."[4] *Id.* at 204.

The meeting ended. Officer Hensley then took Scott—still in handcuffs—to the Juvenile Detention Center in Albuquerque ("JDC"). *Id.* at 69, 225 (Officer Hensley testifying that, pursuant to department policy, he "[p]robably" always handcuffs children when taking them to the Juvenile Detention Center). There, Scott was booked and charged with violating New Mexico Statute section 30-20-13(D), which provides that "[n]o person shall willfully interfere with the educational process of any public or private school by"

---

[4] Charlotte Scott, Scott's mother, testified that she remembered seeing red marks and bruising on his wrists. She said that "you could absolutely see the handcuff [indentation] and the bruising like around it." *Id.* at 210. But she acknowledged that Scott suffered no permanent injuries and did not see a doctor about the injuries. *Id.* at 210, 269.

6

doing anything that "would . . . interfere with or obstruct the lawful mission, processes, procedures or functions of a public or private school." N.M. STAT. ANN. § 30-20-13(D).

Scott filed a lawsuit against Officer Hensley, Chief of Police Ray Schultz, and the City of Albuquerque ("City"). In his complaint, Scott brought claims under 42 U.S.C. § 1983: specifically, invoking the Fourth Amendment, Scott alleged that his arrest was unlawful and that Officer Hensley used unconstitutionally excessive force in effecting the arrest. The complaint also alleged that the arrest violated the ADA, 42 U.S.C. § 12132, and included a municipal-liability claim against the City.[5]

Scott moved for partial summary judgment on his Fourth Amendment claims. The defendants then moved for summary judgment on all of Scott's claims. The district court denied Scott's motion and granted the defendants' motion.

---

[5] Scott also brought claims against Officer Hensley for violations of procedural and substantive due process, state tort law, and the New Mexico state constitution. However, he only appeals from the district court's rulings on his Fourth Amendment claims, his ADA claim, and his municipal-liability claim.

7

## II

In its order, the district court found that Officer Hensley was entitled to qualified immunity on Scott's Fourth Amendment unlawful-arrest and excessive-force claims. Scott argues that the court erred in reaching that conclusion.

We review de novo the district court's grant of summary judgment. *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). We view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. *See, e.g.*, *Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013).

Qualified immunity protects governmental officials from liability for civil damages for conduct that does not violate clearly-established statutory or constitutional rights. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2015) (per curiam). We review qualified-immunity summary-judgment decisions differently from other summary-judgment decisions. *See Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc). When a defendant asserts a qualified-immunity defense, the plaintiff must show (1) that the defendant violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the challenged conduct. *See Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015). If a plaintiff fails to establish either prong, the

8

defendant is entitled to qualified immunity. *See Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015).

**A**

Scott argues that Officer Hensley is not shielded by qualified immunity on the unlawful-arrest claim. Specifically, he contends that (1) the arrest was unconstitutional, since Officer Hensley lacked probable cause; and (2) Officer Hensley should have been on notice that the arrest was unlawful because the Fourth Amendment right that he violated was clearly established at the time.

Scott is half right. The arrest was unconstitutional, but Scott's right was not clearly established in January 2009. The district court correctly determined that Officer Hensley is entitled to qualified immunity on this claim.

**1**

A warrantless arrest violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest. *E.g.*, *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008). An officer has probable cause whenever he knows of reasonably trustworthy facts that would lead a prudent person to believe that the arrestee is committing—or has committed—a crime. *Id.*

More specifically, the question here is whether Officer Hensley had an objectively reasonable belief that Scott had violated section 30-20-13(D). The district court found that he did. It pointed out that "Officer Hensley knew Mr.

9

Scott's absence from health class had involved the time and attention of three school officials" and that it had "disrupt[ed] Ms. Wiggins' preparation for her next class and the class itself." Aplt.'s App. at 314. Based on that information, the court reasoned, "a reasonable officer could have believed that [there was] probable cause" to arrest Scott for violating section 30-20-13(D). *Id.*

We disagree. Our qualified-immunity inquiry focuses on whether Scott's *federal* constitutional rights were violated. *See., e.g.*, *Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution . . . ."). But Scott's unlawful-arrest claim asks us to determine if Officer Hensley had probable cause under a state statute. So, because this is a case in which the federal constitutional question "depends on the contours of a state's substantive criminal law," we rely on New Mexico state courts' interpretations of that law. *Kaufman v. Higgs*, 697 F.3d 1297, 1300–01 (10th Cir. 2012). The New Mexico Supreme Court is the ultimate authority on that question. *Id.* at 1301. "When a state Supreme Court has not spoken on the question at issue, we assume (without deciding) that a reasonable officer would seek guidance regarding the scope of proper conduct at least in part from any on-point decisions of the state's intermediate court of appeals." *A.M. v. Holmes*, 830 F.3d 1123, 1140–41 (10th Cir. 2016), *cert. denied sub nom. A.M. ex rel. F.M. v. Acosta*, 137 S. Ct. 2151 (2017).

10

Section 30-20-13(D) prohibits anybody from "*willfully* interfer[ing] with the educational process." N.M. STAT. ANN. § 30-20-13(D) (emphasis added). The word "willfully" suggests that a violation occurs only when a person acts with the conscious objective of "interfer[ing] with the educational process." *Id.* In other words, it is not enough that a person simply "commit[s] an[] act" that "disrupt[s] . . . [the] functions of" a school; to violate section 30-20-13(D), that person must act with the conscious purpose of "interfer[ing] with the educational process." § 30-20-13(D).

New Mexico's courts have adopted this understanding of "willfulness." In *Rio Grande Gas Co. v. Gilbert*, 491 P.2d 162 (N.M. 1971), the New Mexico Supreme Court faced the question of whether a party's discovery violations had been "willful." *Id.* at 164. In holding that the violations were, in fact, willful, the court noted that "a willful violation of a provision of a statute or regulation is any conscious or intentional failure to comply therewith, as distinguished from accidental or involuntary noncompliance." *Id.* at 166 (quoting *Brookdale Mill v. Rowley*, 218 F.2d 728, 729 (6th Cir. 1954)).

The New Mexico Court of Appeals came to a similar conclusion in *Holguin v. Sally Beauty Supply Inc.*, 264 P.3d 732, 736–37 (N.M. Ct. App. 2011). There, the court was asked to construe a state statute that provided merchants with a conditional privilege to detain a customer when the merchant had probable cause to believe that the customer "willfully conceal[ed]" merchandise. *Id.* at 736–37.

11

The court found that "[t]he term 'willfully' . . . indicates an intent which requires more than merely putting merchandise out of sight." *Id.* at 736.  Instead, the court held that probable cause for the conditional privilege exists only when the facts show "that *the purpose* of the concealment is adverse to the store owner's right to be paid for the merchandise." *Id.* at 737 (emphasis added).  In other words, probable cause for "willful" concealment required a reasonable belief that the customer hid something *for the purpose of stealing it.  Id.*

This understanding of the term "willful" is consonant with the common understanding of the term.  Specifically, "willful" means "intentional" or "deliberate."  THE NEW OXFORD AMERICAN DICTIONARY 1922 (2d ed. 2005).  And, in legal usage, a "willful" act is a "voluntary and intentional" one, "involv[ing] conscious wrong or evil purpose on the part of the actor."  *Willful*, BLACK'S LAW DICTIONARY (10th ed. 2009) [hereinafter BLACK'S]; *see also* Rollin M. Perkins & Ronald N. Boyce, CRIMINAL LAW, 875–76 (3d ed. 1982) ("[T]he requirement added by [the word 'willful'] is not satisfied unless there is a bad purpose or evil intent.").  Or, put another way, "'willfulness' involves the voluntary, *intentional violation* or disregard of a *known* legal duty."  *Willfulness*, BLACK'S, *supra* (emphasis added).

We read the term "willfully" in section 30-20-13(D) in this manner.  More specifically, we conclude that New Mexico legislature sought to bar conduct that was *designed to* "interfere with the educational process," rather than conduct that

12

merely happened to have that effect.  In our view, the statute is not "genuinely

ambiguous," and we are able to reach this conclusion without "hard interpretive

work."  *Heien v. North Carolina*, --- U.S. ----, 135 S. Ct. 530, 541 (2014) (Kagan,

J., concurring).[6]

---

[6]        In *Heien*, in a traffic-stop scenario where reasonable suspicion is ordinarily required, the Supreme Court held that "because [the officer's] mistake of law was reasonable, there was reasonable suspicion justifying the stop."  135 S. Ct. at 540.  The Court explained that its mistake-of-law holding does not relate to the appropriate remedy for a constitutional violation.  *See id.* at 539.  "[B]y contrast, the mistake of law relates to the antecedent question of whether it was reasonable for an officer to suspect that the defendant's conduct was illegal. If so, there was no violation of the Fourth Amendment in the first place."  *Id.*  Though Officer Hensley does not cite *Heien* or contend that he committed a mistake of law in arresting (i.e., seizing) Scott, assuming *arguendo* that *Heien*'s principles apply with full force to Fourth Amendment seizures resulting in arrests, and not just traffic stops, we believe two observations may clarify the course of our analysis.

*First*, the *Heien* majority stressed that "[t]he Fourth Amendment tolerates only *reasonable* mistakes," *id.* at 539, and Justice Kagan helpfully elaborated in concurrence that the laws that might be amenable to such mistakes of law are "genuinely ambiguous" and "pose[] a quite difficult question of interpretation" that involves "hard interpretive work," *id.* at 541 (Kagan, J., concurring); *see also United States v. Diaz*, 854 F.3d 197, 204 n.12 (2d Cir. 2017) (noting that "it is only when the legal question is unsettled that an officer's erroneous assessment of the law can be objectively reasonable").  A panel of our court has similarly viewed *Heien* as laying down restrictive "ground rules" governing its applicability.  *United States v. Cunningham*, 630 F. App'x 873, 876 (10th Cir. 2015) (unpublished).  Given our assessment of the unambiguous nature of section 30-20-13(D), even if Officer Hensley had claimed a mistake of law, he could not avail himself of *Heien*'s holding.  *Cf. Heien*, 135 S. Ct. at 540 (discussing the ambiguities of the North Carolina statute at issue that permitted a reasonable mistake of law); *Cunningham*, 630 F. App'x at 878 & n.6 (conducting a similar analysis of the ambiguities of  a Colorado statute).  That is, we would still conclude that his arrest of Scott violated the Fourth Amendment.

Based on the facts of this case, nothing would have given Officer Hensley the reasonable belief that Scott was "willfully" trying to interfere with the educational process at Grant Middle School. True, Scott's absence eventually led to somebody pulling Ms. Wiggins from her classroom and Ms. Griego from her desk. Aplt.'s App. at 72 (Officer Hensley testifying that he "got Ms. Wiggins" and "took her out of class"). But no reasonable officer would have believed that Scott went to the janitor's office *with the intent* of distracting school employees from other tasks. Indeed, Scott gave every indication that he was not trying to cause a disruption or break a rule. He made no disturbance as he left his classroom, and told Officer Hensley and Ms. Wiggins that he believed that he had

_____

And, *second*, our conclusion that Officer Hensley could not claim a reasonable mistake of law does not mean that he cannot demonstrate that he satisfies the qualified-immunity standard on the clearly-established-law element, and indeed we conclude *infra* that he has. In this regard, *Heien* stressed that "qualified immunity . . . depends on an inquiry distinct from whether an officer has committed a constitutional violation" and that "the [constitutional-violation] inquiry is *not as forgiving* as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." *Heien*, 135 S. Ct. at 537, 539 (emphasis added); *see also Corrigan v. District of Columbia*, 841 F.3d 1022, 1046 (D.C. Cir. 2016) (Brown, J., dissenting) ("What 'every reasonable' official would have understood to be 'clearly established' in case law is not the same question as what is 'objectively reasonable' for purposes of determining a Fourth Amendment violation."). Therefore, under the less stringent qualified-immunity inquiry, we may conclude (as we do) that Officer Hensley is entitled to qualified immunity because his "conclusions rest[ed] on an objectively reasonable, even if mistaken, belief that probable cause exist[ed]." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014); *see A.M.*, 830 F.3d at 1140 (collecting cases regarding the concept of "arguable probable cause").

permission to be outside the classroom at the time. If anything, Scott left the classroom to *avoid* disrupting his class: he left because he knew that when "[he] would get too antsy or frustrated, . . . it would just be bad if [he] kept on" trying to work through the typing lesson. *Id.* at 200. That, after all, was the purpose of his IEP accommodations in the first place. *See id.* at 208 (Test. of Charlotte Scott) (commenting that the IEP accommodations were in place because "th[e] teachers and administrators] didn't want [Scott] to explode in the classroom").

None of this would suggest that Scott "willfully interfer[ed] with the educational process" by going to, and sitting in, the janitor's office. *Cf. G.M. ex rel. B.M. v. Casalduc*, 982 F. Supp.2d 1235, 1243 (D.N.M. 2013) ("B.M.'s conduct does not clearly fall outside the conduct prohibited by the plain language of the statute [i.e., section 30-20-13(D)]. B.M. ignored numerous requests to stop texting during class in violation of HMS policy. Unable to continue instruction, her teacher stopped class and eventually summoned Dean O'Gawa. After being removed from class, B.M. continued refusing to hand over her cell phone as required by school procedure."). We conclude, therefore, that Officer Hensley had no probable cause to arrest Scott under section 30-20-13(D). And since a warrantless arrest without probable cause violates the Fourth Amendment, *Keylon*, 535 F.3d at 1216, Scott has shown that Officer Hensley violated Scott's right to be free from unlawful arrest.

**2.**

15

The next question is whether that right was clearly established in January 2009. A plaintiff ordinarily may show that a particular right was clearly established by pointing to an on-point decision from the U.S. Supreme Court or the Tenth Circuit. *See, e.g.*, *Quinn*, 780 F.3d at 1005. But, as previously noted, we often look to state-court decisions when we are asked to decide a question that "depends on the contours of a state's substantive criminal law." *Kaufman*, 697 F.3d at 1300–01; *see also A.M.*, 830 F.3d at 1140–41 (noting that state intermediate appellate courts can provide guidance in a clearly-established-law inquiry that involves construing state criminal law).

In *A.M.*, where an officer arrested a student under section 30-20-13(D) for "repeatedly fake-burping, laughing, and (later) leaning into the classroom," 830 F.3d at 1148, we held in analyzing the clearly-established-law question that there were "no Supreme Court or published Tenth Circuit decisions" that squarely addressed 30-20-13(D)'s probable-cause requirements in 2011, *id.* at 1140. The same necessarily must be true for Officer Hensley's violation, which occurred almost two years before the challenged conduct in *A.M.*

Without any on-point federal cases, Scott relies instead on *State v. Silva*, 525 P.2d 903, 903 (N.M. Ct. App. 1974), a 1974 case from the New Mexico Court of Appeals. "Silva involved a distant statutory predecessor of N.M. Stat. Ann. § 30–20–13." *A.M.*, 830 F.3d at 1143. Under that provision, students who staged a sit-in inside a university president's office were charged with interfering with the

16

"mission, processes, procedures or functions" of a university. *Id.* at 905 (quoting

N.M. STAT. ANN. § 40A-20-10(C) (1974)). Scott contends that *Silva* constitutes

clearly-established law that defined the contours of probable cause for his arrest.

However, in *A.M.*, we rejected an attempt to rely on *Silva* for clearly-established

law in very analogous circumstances. *See* 830 F.3d at 1145. We view that

conclusion as controlling here.[7]

---

[7]  We recognize that pre-2009 Supreme Court authority in New Mexico had established a general understanding of the term "willful," *Gilbert*, 491 P.2d at 164, 166, and (as demonstrated *supra*) the illegality of Officer Hensley's arrest of Scott turns at least in substantial part on that understanding. In contrast, this was arguably not true in the analogous case of *A.M. See e.g.*, 830 F.3d at 1148 (arresting student for "repeatedly fake-burping, laughing, and (later) leaning into the classroom"). However, as *A.M.* indicates, no controlling federal or New Mexico caselaw had clearly established the requirements for probable cause under section 30-20-13(D) in January 2009—including regarding the "willfulness" requirement. More specifically, no New Mexico appellate court had applied the general understanding of "willfulness" to a prosecution under section 30-20-13(D). In our view, in the circumstances of this case, that forecloses the possibility of finding clearly-established law. "As th[e] [Supreme] Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, --- U.S. ----, 137 S.Ct. 548, 552 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see Mullenix v. Luna*, --- U.S. ----, 136 S. Ct. 305, 308 (2015) ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011))). Here, Scott has not demonstrated that it was clearly-established law in January 2009 that the general understanding of "willfulness" was controlling in the section 30-20-13(D) context—by "identif[ing] a case where an officer acting under similar circumstances as Officer [Hensley] was held to have violated the Fourth Amendment," *White*, 137 S. Ct. at 552, or otherwise. In particular, we conclude that the settled general understanding among New Mexico courts regarding the meaning of "willful" would not have put the unlawfulness of Officer Hensley's conduct under section 30-20-13(D) "beyond debate" in January 2009. *al-Kidd*, 563 U.S. at 741; *accord Mullenix*, 136 S. Ct. at 308.

17

In short, Scott has not identified any clearly-established law that would have given Officer Hensley "fair notice that his conduct would be unlawful in the circumstances he confronted." *Id.* at 1141. Accordingly, Scott cannot satisfy the second prong of the qualified-immunity standard; his Fourth Amendment unlawful-arrest claim necessarily fails.

**B**

Scott also challenges the district court's rejection of his excessive-force claim. Scott argues that "the force Officer Hensley used—in parading [Scott] through the school's halls in handcuffs and transporting him to the JDC—[was] excessive." Aplt.'s Opening Br. at 25. He notes that the arrest took place in front of his peers and other students, and that the tight handcuffs left his wrists bruised and swollen for a week after the arrest. The district court ruled that Scott had not demonstrated a constitutional violation. We agree, and conclude that Officer Hensley is entitled to qualified immunity on this claim.

"Under well-settled Supreme Court precedent, a law-enforcement officer's 'right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion . . . to effect it." *A.M.*, 830 F.3d at 1151 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). We evaluate excessive-force claims under an objective-reasonableness standard, using the perspective of a reasonable officer on the scene. *See, e.g.*, *Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective

18

of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *Weigel v. Broad*, 544 F.3d 1143, 1151 (10th Cir. 2008) ("The 'inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent or motivation.'" (quoting *Graham*, 490 U.S. at 397)); *see also Lungstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010) ("The reasonableness of a police officer's actions is evaluated from the perspective of a reasonable officer on the scene, recognizing the police officer may have been forced to make split-second decisions in a stressful, dynamic, and dangerous environment.").

We consider the totality of the circumstances to determine if an officer's actions were objectively reasonable. *See, e.g.*, *Thomson*, 584 F.3d at 1313 (noting that "[r]easonableness is evaluated under a totality of the circumstances approach"); *accord Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). This involves (but is not limited to) examining "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Critically, however, "our precedent requires a showing in a handcuffing case of an actual, non-de minimis physical, emotional, or dignitary injury to succeed on a claim." *Fisher v. City of Las Cruces*, 584 F.3d 888, 899 (10th Cir.

19

2009); *accord A.M.*, 830 F.3d at 1151–52; *see also Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (en banc) ("We believe that a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional."). "This is because '[h]andcuffing claims, in essence, concern the manner or course in which a petitioner is handcuffed,' and '[b]ecause handcuffing itself is not necessarily an excessive use of force in connection with an arrest.'" *A.M.*, 830 F.3d at 1152 (alterations in original) (quoting *Fisher*, 584 F.3d at 897); *cf. United States v. Rodella*, 804 F.3d 1317, 1327 (10th Cir. 2015), *cert. denied*, 137 S.Ct. 37 (2016) (concluding that *Cortez*'s non-de-minimis-injury requirement "is limited to handcuffing cases"). Like the district court, we conclude that Scott's excessive-force claim fails to satisfy this non-de minimis-injury standard. Quite apart from whether one or more of the *Graham* factors noted above (e.g., severity of the crime) favors him, this failure is determinative.

Scott alleges that the cuffs were "uncomfortably tight" when Officer Hensley put them on. Aplt.'s App. at 203. Ms. Wiggins loosened the cuffs after about twenty minutes, but Scott testified that he was in pain for the week after the arrest. Unduly tight handcuffs can, in some cases, amount to excessive force. *See Cortez*, 478 F.3d at 1128–29 ("In some circumstances, unduly tight handcuffing can constitute excessive force *where a plaintiff alleges some actual injury* from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight."

20

(emphasis added)).  But a plaintiff still must make a showing that the handcuffs caused "some actual injury that is not de minimis" before we can find a constitutional violation.  *Id.* at 1129.  Scott fails to make this showing.

Scott testified that his wrists "were bruised and swollen" for "about a week" after the arrest, and that "anything [he] did [that involved] moving [his] wrists hurt."  Aplt.'s App. at 131, 204.  He also alleged that the cuffs left "redness, soreness and indentations" on his wrists.  *Id.* at 115 (Pl.s' Interrog. No. 17).  Yet, he concedes that he never got any medical treatment for his injuries and that the injuries were gone after about a week.

This is not enough to show a constitutional violation.  We have rejected minor, temporary injuries—like pain, numbness, or swelling—as de minimis in handcuff-related excessive-force cases.  For example, in *Koch v. City of Del City*, 660 F.3d 1228, 1247–48 (10th Cir. 2011), we concluded that a plaintiff had failed to show "'actual injury'" when she alleged superficial abrasions and lingering nerve pain in her wrists.  *Id.*  Similarly, in *Segura v. Jones*, 259 F. App'x 95, 103–04 (10th Cir. 2007) (unpublished), a panel of our court found no more than a de minimis injury stemming from tight handcuffs.  *Id.*; *cf. Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1209–10 (10th Cir. 2008) (concluding that a plaintiff established a constitutional violation when tightened handcuffs caused permanent nerve damage in plaintiff's wrist).

21

Scott's injuries are no different. Even though he was in pain for hours while wearing the handcuffs, that pain did not last long. And the handcuffs left no permanent injury: the swelling went down after about a week, and the bruises faded around the same time. *See* Aplt.'s App. at 204 (Scott testifying that he had no "problems with [his] wrists" on the day he was deposed). Simply put, Scott's injuries were not severe enough to render Officer Hensley's force excessive.[8]

The same is true for Scott's emotional injuries. Scott said that he was humiliated when Officer Hensley walked him through the school hallways in handcuffs during a break between classes. Scott felt that Officer Hensley had "made it his mission to embarrass [him] and set it in [Scott's] head that [he] was a piece of shit." Aplt.'s App. at 198. However, Officer Hensley's intent cannot factor into our analysis. *See Graham*, 490 U.S. at 396 (noting that the excessive-force analysis should be "without regard to . . . underlying intent or motivation"); *accord Weigel v. Broad*, 544 F.3d at 1151. To be sure, we have recognized that, in some cases, an excessive-force claim may stand on an emotional injury like

---

[8] Though the inadequacy of Scott's injuries do not make the following point material to our analysis, we note that Scott's injuries may in part stem from his own conduct rather than any physical aggression of Officer Hensley. By Scott's own admission, he would abruptly stop while being led through the hallway in handcuffs by Officer Hensley because he was "pissed" and did not anyone to "touch" him. Aplt.'s App. at 202. Even accepting Scott's own version of the facts then, we may reasonably infer that, insofar as Scott's injuries were caused by the friction between the handcuffs and his wrists, his abrupt stops contributed to or exacerbated that friction.

22

humiliation. *See, e.g.*, *Fisher*, 584 F.3d at 903. But, in the context of an arrest, the alleged humiliation must be more harmful than that which accompanies the typical custodial arrest. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *Petersen v. Farnsworth*, 371 F.3d 1219, 1223 (10th Cir. 2004).

Scott's arrest does not fit that description. Though Scott was surely humiliated when his peers saw him walking through the hallways in handcuffs, a public arrest does not violate the Fourth Amendment simply because it is embarrassing. *See Atwater*, 352 U.S. at 354–55; *Cortez*, 478 F.3d at 1128. In short, Officer Hensley's use of force fell short of being "excessive," as the law defines that term. Scott has therefore failed to show a constitutional violation.[9]

---

[9]  We are not blind to the obvious facts: At the time of the arrest, Scott was thirteen years old. The psychological effects of an arrest on somebody that young are bound to be more severe than they would be for an adult. *See Hedgepeth v. Wash. Metro Area Transit*, 284 F. Supp. 2d 145, 160 (D.D.C. 2003), *aff'd sub nom. Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148 (D.C. Cir. 2004) (noting that, though a child's arrest was constitutional under the applicable legal standard, "the Court can hardly overlook the humiliating and demeaning impact of the arrest" on that child); *cf. A.M.*, 830 F.3d at 1150 n.15 ("We are neither oblivious nor unsympathetic to 'the potential future consequences to [a] child,' such as F.M., of an arrest or other law-enforcement sanction for seemingly non-egregious classroom misconduct; such a law-enforcement response could potentially have a 'far-reaching impact' on a child's ability to lead a productive life." (quoting *Hawker v. Sandy City Corp.*, 774 F.3d 1243, 1244 (10th Cir. 2014) (Lucero, J., concurring))). However, we have held that there is "'no case law . . . applying a different standard when the victim of the alleged excessive force is a minor.'" *A.M.*, 830 F.3d at 1155 (quoting *Hawker v. Sandy City Corp.*, 591 F. App'x 669, 674 n.8 (10th Cir. 2014) (unpublished) (emphasis omitted)). And we are bound to apply the law of excessive force as it is—not as we might wish it to be—even when, as here, the results might seem troubling. *See, e.g.*, *A.M.*, 830 F.3d at 1169 (Gorsuch, J.,

23

Scott also argues that the City employed a "de facto policy" of (1) failing to train SROs "before placement in a school which serves special education students," and (2) giving SROs "unbridled discretion to arrest students with special needs." Aplt.'s Opening Br. at 37, 39. These policies, Scott argues, effectively "require[d] the arrest" of Scott for skipping class on January 16, 2009.[10] *Id.* at 37.

To establish municipal liability, a plaintiff must show (1) the "existence of a municipal custom or policy" and (2) a "direct causal link between the custom or policy and the violation alleged." *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir. 1996). "To establish the causation element, the challenged policy or practice

dissenting); *Hawker*, 774 F.3d at 1243–46 (Lucero, J., concurring).

[10] Insofar as Scott's municipal-liability arguments are predicated on Officer Hensley's claimed use of excessive force, they fail at the outset. Without an underlying constitutional violation, a municipal-liability claim is fatally infirm. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."); *see also Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996) ("The district court correctly concluded no municipal liability could be found in this case because there was no constitutional violation committed by any of the individual defendants."). Furthermore, Scott's briefing seemingly challenged the district court's judgment regarding his supervisory-liability claim against Albuquerque's chief of police, Ray Schultz. *See* Aplt.'s Opening Br. at 40 ("Scott's supervisory liability claim against Chief Schultz is also viable assuming that the Court finds a violation of Scott's rights."). However, during oral argument, Scott's counsel expressly and unequivocally indicated that actually Scott does not pursue a supervisory-liability claim against Chief Schultz on appeal—*viz.*, he does not challenge the district court's judgment as to this claim. Therefore, that matter is not before us.

must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (quoting Martin A. Schwartz, SECTION 1983 LITIGATION CLAIMS & DEFENSES, § 7.12[B] (2013)); *accord Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 932 (10th Cir. 2013) (unpublished). In this regard, a "municipality is not liable solely because its employees caused an injury," but rather, because the municipality, "[t]hrough its [own] deliberate conduct, . . . [was] the 'moving force' behind the injury." *Mocek v. City of Albuquerque*, 813 F.3d 912, 933 (10th Cir. 2015).

Scott fails to meet this standard. Specifically, he has not demonstrated that the alleged policies that he has identified—failing to train SROs placed in special-education school settings and giving them free rein in arresting special-needs children—are directly relevant to the constitutional violation—i.e., arresting a student without probable cause that the student *willfully* interfered with the educational process at a school—much less that the policies were the "moving force" behind the violation. *Mocek*, 813 F.3d at 933. For example, Scott does not specify what training the officers should have possessed and how the lack of that training was a moving force behind his unlawful arrest. Furthermore, his assertion that the City, as a matter of de facto policy, granted its officers "unbridled discretion" to arrest special-needs students is wholly conclusory. And, even if Scott were able to demonstrate that the City's SROs repeatedly arrested

25

special-needs students under section 30-20-13(D) for willful interference with the educational process, one could not reasonably infer from this proof—without more—that such conduct was the product of an unconstitutional de facto policy. Special-needs students are not immune from arrest under this statute, and section 30-20-13(D) may well reach in certain instances willful conduct committed by such students that amounts to (in Scott's words) no more than "childhood misbehavior."[11]  Aplt.'s Opening Br. at 41.  Accordingly, these two policies cannot sustain Scott's municipal-liability claim.

Scott tries again in his reply brief.  There, he shifts the focus away from special-needs students and simply avers that there was "a pattern of Albuquerque police officers enforcing [section 30-20-13(D)] in an over broad manner."  Aplt.'s Reply Br. at 7.  But that argument also fails to establish municipal liability.  First, the argument was never raised in his opening brief, so we consider it waived.

---

[11]    As evidentiary support for his municipal-liability claim, Scott directs us to the testimony of a Juvenile Probation Officer and to a summary of City police reports prepared by Scott's counsel.  Even assuming that all of this is properly admissible evidence, it is woefully insufficient to establish that the two policies Scott identifies in his opening brief were the moving force in his unlawful arrest.  First, though this evidence purports to show that young children were repeatedly arrested by the City's police for violations of section 30-20-13(D), it is silent regarding whether these children had special needs.  Second, many (if not most) of the arrests that Scott's counsel identifies in his summaries involved, at least arguably, willful misconduct, which would place them on the question of intent within the ambit of section 30-20-13(D).  *See* Aplt.'s App. at 235–40 (describing arrests for, among other things, "knocking over a chair and throwing a pen," "throwing a stick when told not to," "blowing up a condom in class," and "[s]tepping toward a teacher in an aggressive manner").

26

*United States v. Wayne*, 591 F.3d 1326, 1332 n.4 (10th Cir. 2010) ("Because [the appellant] raised this argument for the first time in her reply brief, she has waived it on appeal.").

And second, even if we did consider the argument, it still fails to show municipal liability. The policy articulated in Scott's reply brief concerns officers' practice of arresting students for "disruptions that were not the result of 'physical intrusions.'" Aplt.'s Reply Br. at 6–7. Scott's argument on this point seems derived from his reading of *Silva*, 525 P.2d at 907, in which the New Mexico Court of Appeals found that the statute at issue required a "more physical invasion" than a simple disturbance of the peace. But we rejected this analogy in *A.M.,* 830 F.3d at 1144–48 (declining to use *Silva* to guide our construction of section 30-20-13(D)). Simply put, an officer *may* arrest a student under section 30-20-13(D), even when the student's conduct does not involve a physical intrusion. Thus, even if the City had a policy that authorized officers to make such non-physical-intrusion arrests when supported by probable cause, that policy would not run afoul of the Constitution. Accordingly, it ineluctably follows that such a policy could not have directly caused (i.e., been the moving force behind) the constitutional violation here.

In sum, for the foregoing reasons, Scott's municipal-liability claim is without merit.

**IV**

27

Finally, Scott argues that the district court erred in granting summary judgment to the defendants on his ADA claim. We disagree.

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. To make out his ADA claim, Scott has to show that he (1) has a disability; (2) was discriminated against by a public entity; and (3) the discrimination was "by reason of [his] disability." *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999).

Scott argues that "[i]f [he] had not been disabled, he would have had no need to leave class." Aplt.'s Opening Br. at 33. When "Officer Hensley handcuffed, arrested, transported and charged Scott," he continues, Officer Hensley did so "*because* [Scott] was disabled." *Id.* (emphasis added).

Not so. In some cases, a plaintiff's "disability might cause the police to incorrectly suspect that an individual committed a crime." *J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d 1255, 1260 (10th Cir. 2015). But Scott is not arguing that Officer Hensley mistook his disability itself for illegal conduct. Instead, he argues that Officer Hensley arrested Scott because of the *manifestations* of his disability. *See* Aplt.'s Opening Br. at 21 ("Officer Hensley violated the ADA by arresting [Scott] for a manifestation of his disability.")

28

And we have repeatedly rejected such arguments. For instance, *J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d at 1260, we held that an SRO did not arrest a student "because of [his] disability" when the student kicked a teacher; we expressly held that an arrest based on the manifestation of a student's disability was not equivalent to an arrest *because* of that disability. And, in *J.V. v. Albuquerque Public Schools*, 813 F.3d 1289, 1296 (10th Cir. 2016), we held that a SRO did not arrest a student "by reason of disability" when the student was disruptive for two hours. *Id.* In doing so, we noted that there was "no authority suggesting [that] a school may not regulate a student's conduct if that conduct is a manifestation of a disability." *Id.* This case is no different from *J.H.* or *J.V.* Officer Hensley did not arrest Scott because Scott was disabled; he arrested Scott because he thought that Scott was "interfer[ing] with the educational process." § 30-20-13(D).

Scott also argues that the City, through Officer Hensley, failed to provide reasonable accommodations to Scott during the arrest. Specifically, he alleges that "the City established no meaningful policies to accommodate disabled children" and "require[d] that all children . . . be transported by an officer [while] handcuffed," regardless of "the child's age or health status." *Id.* at 36. Scott contends that this policy violated his rights under the ADA.

We have never adopted a failure-to-train claim of discrimination under the ADA in the context of an arrest. *See, e.g.*, *J.V.*, 813 F.3d at 1297 ("This circuit

29

has not recognized a failure-to-train claim of discrimination under the ADA, but we have not foreclosed the possibility."); *Gohier*, 186 F.3d at 1221. But, even assuming *arguendo* this was the law here, Scott's claim would still fail.

Crucially, Scott never points to any evidence of (1) a request for an accommodation; or (2) a reason that Officer Hensley should have known that he needed an accommodation. Instead, he points only to the fact that Officer Hensley knew about Scott's diagnosis of bipolar disorder. (The record bears this out. In his deposition, Officer Hensley was asked if Scott had been "diagnosed with bipolar disorder[.]" Aplt.'s App. at 67. He replied that Scott's "parents had told [Officer Hensley] that" during a meeting with Officer Hensley. *Id.* That meeting was "probably the week prior to [Scott's] arrest." *Id.*)

But knowledge of that diagnosis, without more, would not necessarily make Officer Hensley aware that Scott needed an accommodation. *See J.V.*, 813 F.3d at 1299 ("[A]n ADA plaintiff must show an obvious need for an accommodation."); *J.H.*, 806 F.3d at 1261 (concluding that it would "conflate[] a disability with a need for an accommodation" to expect an accommodation whenever an official is aware of a diagnosis).

And though Scott argues that the City's failure to train amounted to a failure to accommodate his disability, he never explains why. His claim fails without that explanation. *See, e.g.*, *J.V.*, 813 F.3d at 1300 n.8 ("While plaintiff attempts to pose training in dealing with those with mental health problems a an

30

'accommodation,' it is well-settled that the failure to train must have caused some violation of law for an action against a municipality to lie." (quoting *Waller ex. rel. Estate of Hunt v. Danville, Va.*, 556 F.3d 171, 177 n.3 (4th Cir. 2009))).

## V

We **AFFIRM** the district court's judgment.

Entered for the Court


JEROME A. HOLMES
Circuit Judge

31